J-A04043-18

2018 PA Super 112

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| AYYAKKANNU MANIVANNAN | : | |
| Appellant | : | No. 1661 MDA 2016 |

Appeal from the Judgment of Sentence June 10, 2016
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0000017-2016,
CP-14-CR-0001124-2015

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| AYYAKKANNU MANIVANNAN | : | No. 1693 MDA 2016 |

Appeal from the Judgment of Sentence June 10, 2016
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0000017-2016,
CP-14-CR-0001124-2015

BEFORE: STABILE, J., NICHOLS, J., and RANSOM*, J.

OPINION BY RANSOM, J.:                                          **FILED MAY 04, 2018**

In this consolidated appeal, Ayyakkannu Manivannan ("Appellant"), appeals from the judgment of sentence of four and one-half years of probation, imposed June 10, 2016, following a jury trial resulting in his conviction of five counts of unlawful use of computer and one count of

_____

* Retired Senior Judge assigned to the Superior Court.

harassment.[1] The Commonwealth cross-appeals. After careful review, we are constrained to vacate the judgment of sentence, to remand for a new trial, and to dismiss the Commonwealth's appeal. Additionally, we grant Appellant's Application for Leave to File Post-Submission Supplemental Authority.

In August 2011, Faith Beck began to work with Appellant at the United States Department of Energy's ("DOE") National Energy Technology Laboratory ("NET Lab") located in Morgantown, West Virginia, where Appellant also lives. Notes of Testimony (N.T.), 4/18/16, at 64-68, 90, 127-28. The two began a romantic relationship, and Ms. Beck occasionally used Appellant's computer to access her email account during this time. Ms. Beck did not give Appellant permission to access her email account. In 2013, Appellant helped Ms. Beck enroll in a one-year graduate program at Pennsylvania State University and secured funding for tuition through DOE. *Id.* at 65-67. Ms. Beck continued to work at the NET Lab with Appellant. *Id.* at 91. In November 2013, Ms. Beck began a romantic relationship with fellow student Partha Mishra and endeavored to end her romantic relationship with Appellant. *Id.* at 68, 78.

By January 2014, Appellant was repeatedly contacting Ms. Beck daily by phone call, text message, email, and Skype. *Id.* at 71-72, 80-89, 92-94. One night, Ms. Beck and Mr. Mishra were sitting in her car in a parking lot when Appellant pulled up behind them. *Id.* at 95-99. Appellant followed Ms. Beck

---

[1] 18 Pa.C.S. §§ 7611(a)(2) and 2709(a)(7), respectfully.

as she drove to a local police station and pulled over as she did, whereupon she told him to stop following her. *Id.* Ms. Beck reported the incident to Officer Jessica Meyer of Pennsylvania State University Police and explained that Appellant was repeatedly contacting her. *Id.* at 99; N.T., 4/19/16, at 8-9.

Ms. Beck also testified that, in March 2014, Appellant sought a meeting with her under the guise that she was meeting her supervising professor, only to find Appellant to be the sole other person in attendance. N.T., 4/18/16, at 115. Following this incident, Ms. Beck secured funding for her program from the University so that she no longer needed to work at NET Lab under the supervision of Appellant. *Id.* at 102-13. In April 2014, she informed the DOE that she would not be returning to her position at NET Lab. *Id.* at 112, 115.

Ms. Beck testified that, in July 2014, she and Mr. Mishra planned a weekend trip to Falling Water, located approximately an hour away from Morgantown, West Virginia. *Id.* at 119; Commonwealth's Exhibit 57. At Falling Water, she was advised by two individuals with whom she was familiar that Appellant was there. *Id.* at 120. Suspicious that Appellant's presence was more than mere coincidence, Ms. Beck spoke with her mother and learned that the accommodation information for the weekend trip was forwarded to her mother from Ms. Beck's email address, although Ms. Beck did not send the emails herself. *Id.* at 121-29. Two emails were forwarded to Ms. Beck's mother. *Id.* The first email, dated July 2, 2014, at 10:25 p.m., contained a room reservation at a bed and breakfast for the night before the trip to Falling

Water. *Id.* The second email, dated July 2, 2014, at 1:43 a.m., contained reservation details for a hotel room on the date of the visit to Falling Water. *Id.* A third email, sent on July 2, 2014, was forwarded to Ms. Beck's sister and contained a G-chat instant message conversation between Ms. Beck and Mr. Mishra that contained sexual content. *Id.* at 129-39.

Upon investigating her email account settings, particularly her account history, Ms. Beck and Mr. Mishra discovered that from June 22, 2014, to July 18, 2014, her account was accessed twenty-one times from thirteen different Internet Protocol ("IP") addresses located in: Boston, Massachusetts; Boulder, Colorado; Houston, Texas; Metairie, Louisiana; San Francisco, California; San Jose, California; Los Angeles, California; and Morgantown, West Virginia. *Id.* at 121-26, 260-63. They took screenshots of this suspicious account activity, and Mr. Mishra forwarded the screenshots to Officer Meyer. *Id.* at 257-68. Of note, Ms. Beck's email account was accessed five times from IP address 98.239.142.39 in Morgantown. *Id.* at 261; N.T., 4/19/16, at 19. Each of these screenshots feature the designation "Comcast.net" under the IP address. *See* Commonwealth's Exhibits 60-64.

Officer Meyer testified that upon receiving the screenshots from Mr. Mishra, she utilized the website Geektools.com to determine the internet providers corresponding to the thirteen IP addresses identified in the screenshots. N.T., 4/19/16, at 13-18. Appellant objected to any reference to that website as hearsay, but the trial court overruled the objection. *Id.* at 14.

Based upon her search results from Geektools.com, Officer Meyer secured from the trial court a series of particularized subpoenas to each internet provider for the subscriber information during the dates and times reflected on the corresponding screenshots. *Id.* at 15-19. Comcast was the only internet service provider that returned subscriber information in response to the subpoenas. *Id.* at 18-19. Specifically, the search on Geektools.com identified Comcast Cable Communications, Inc. ("Comcast") as the internet provider for the IP address 98.239.142.39 in Morgantown, West Virginia. *Id.* The trial court overruled Appellant's timely objection that printouts and content from Geektools.com were inadmissible hearsay. *Id.* at 14.

During Officer Meyer's testimony, the Commonwealth attempted to introduce Exhibit 10, a faxed letter on Comcast letterhead addressed to Officer Meyer, and which outlined that IP address 98.239.142.39 belonged to subscriber Manivannan on July 12, 2014, at 9:34 a.m. and 10:40 a.m.; July 17, 2014, at 1:32 a.m. and 12:47 p.m.; and July 18, 2014, at 11:25 a.m., five of the times Ms. Beck's account was accessed without her permission. *Id.* at 19; Commonwealth's Exhibit 10. These five instances of access were cited as the basis for Appellant's five, unlawful use of computer charges. *See* Amended Information, 4/6/2016. Additionally, the letter listed Appellant's home address in Morgantown as the service address and included "Ayyakkannu" as one of the email user names associated with the account. Commonwealth's Exhibit 10. Dated August 29, 2014, the letter did not indicate an individual author and was signed "Comcast Legal Response

Center." *Id.* The date stamp on the letter indicates it was sent to Pennsylvania State University Police on September 4, 2014. *Id.*

Appellant timely objected to the admission of the Comcast letter and argued that (1) no individual author of the Comcast letter was identified in the unsigned document, which made the veracity of the document itself dubious, and (2) an original of the document was required under Pa.R.E. 1002. N.T., 4/19/16, at 19-24.

As certification for the Comcast letter, the Commonwealth provided the trial court with a separate, faxed, boilerplate Pa.R.E. 902(11) declaration dated April 18, 2016, that gave no context for the document its signor purported to certify. *See* Declaration by Custodian or Other Qualified Person Pursuant to Pa.R.E. 902(11): Domestic Records of Regularly Conducted Activity, 4/18/16. The boilerplate declaration made no reference to Comcast or the Comcast letter, was not attached to same, and the date stamp indicated the document was faxed to Pennsylvania State University Police on April 18, 2016. *Id.* The Commonwealth presented no evidence that certification accompanied the Comcast letter.

Appellant also timely objected to the certification, because (1) it was tendered separately from the letter and may not even belong to the letter and (2) an original of that document was likewise required under Pa.R.E. 1002. N. T., 4/19/16, at 19-24; *see also* Appellant's Brief at 19.

At sidebar, the Commonwealth argued that the Comcast letter was admissible as a business record pursuant to Pa.R.E. 902(11). N. T., 4/19/16,

at 19-24. The trial court overruled Appellant's objection, and the Comcast letter was admitted into evidence. *Id*.

Receipts submitted to the DOE established that Appellant was on a business trip in Los Angeles from June 29, 2014, to July 6, 2014, which corresponded to the four times Ms. Beck's email was accessed from Los Angeles and once from an indeterminable location in the state of California. N.T., 4/18/16, at 279, 282-88.

In April 2016, Appellant was convicted of the aforementioned charges. N.T., 4/19/16, at 297. At Appellant's sentencing hearing in June 2016, Appellant made an oral motion for extraordinary relief in the form of a new trial, averring the admission of the Comcast letter and certification was improper, as originals of the documents were required pursuant to Pa.R.E. 1002 and 1003. N.T., 6/10/16, at 3-8. The trial court denied the motion for extraordinary relief. *Id.* at 9. Appellant was sentenced to six months of probation on the misdemeanor harassment and two years of probation on each of the five felony computer convictions, with the harassment sentence and two of the computer sentences to run consecutively, for a total term of four and one-half years of probation. *Id*. at 18-26. Over the objection of the Commonwealth, the trial court also prohibited Appellant "from being in the Commonwealth of Pennsylvania except for the purpose of having contact with the Centre County Probation and Parole Department." *Id*.

In June 2016, the Commonwealth timely filed a motion to modify sentence, arguing that the court's stated reason for mitigating Appellant's

sentence was an unenforceable, unconstitutional prohibition on Appellant's right to travel. Commonwealth's Motion to Modify Sentence, 6/20/2016 at 1-4. The trial court denied the Commonwealth's motion in September 2016; however, the court removed its previously imposed restrictions banning Appellant from entering or being within the Commonwealth of Pennsylvania. Order, 9/9/2016.

In October 2016, the parties timely filed cross-appeals from the Appellant's judgment of sentence. Both parties timely filed court-ordered Pa.R.A.P. 1925(b) statements, and the court filed a responsive opinion to each respective appeal. This Court *sua sponte* consolidated the appeals in November 2016. In January 2017, the Appellant and the Commonwealth jointly filed a stipulation to correct or modify the record, attaching an additional, one-page document titled, "Declaration by Custodian or Other Qualified Person Pursuant to Pa.R.E. 902(11): Domestic Records of Regularly Conducted Activity," which was not previously included in the certified record transmitted to this Court. Stipulation to Correct of Modify the Record, 1/31/2017. This was the boilerplate Pa.R.E. 902(11) declaration purporting to certify the Comcast letter.

On appeal, Appellant presents the following issues for our review:

1. Did the trial court err by admitting into evidence an unsigned letter from Comcast (the "Comcast letter"), the only evidence linking Dr. Manivannan to the IP address allegedly used to "hack" into the victim's Gmail account, where the Commonwealth failed to properly authenticate the letter under Pa.R.E. 902(11), it was inadmissible hearsay, and where

admitting the letter violated Dr. Manivannan's right to confront the witnesses against him under the United States Constitution?

2. Did the trial court err by admitting printouts from the website GeekTools.com identifying Comcast as the service provider for the IP address allegedly used to "hack" into the victim's Gmail account, where the printouts and testimony about their contents were inadmissible hearsay?

3. Was the lay testimony of Faith Beck, Partha Mishra, and Officer Meyer legally sufficient to prove beyond a reasonable doubt that someone using IP address 98.239.142.39 unlawfully accessed Faith Beck's Gmail account five times on July 12, 17, and 18, 2014, as required for the convictions for unlawful use of a computer under 18 Pa.C.S. § 7611(a)(2)?

Appellant's Brief at 2-3 (some formatting added). The Commonwealth presents the following issue for our review:

1. Whether the sentencing court abused its discretion in sentencing [Appellant] to the mitigated range of the sentencing guidelines.

Commonwealth's Brief at 6 (some formatting added). We begin our discussion with a review of Appellant's claims.

In his first claim, Appellant asserts that it was prejudicial error to admit the Comcast letter and advances two arguments in support of this challenge. Appellant's Brief at 21-46. First, according to Appellant, the Commonwealth failed to authenticate properly the Comcast letter under Pa.R.E. 902(11). *Id.* Thus, Appellant concludes that the letter was inadmissible hearsay. Moreover, Appellant suggests the letter was highly prejudicial, as its contents permitted the jury to conclude that Appellant unlawfully hacked into the victim's email, "sending both electronic communications about [Ms.] Beck's personal life to

her mother and sister, and a non-verbal message to [Ms.] Beck directly that he was watching her." Appellant's Brief at 36-37. Second, and in the alternative, Appellant suggests that admission of the Comcast letter violated his constitutional right to confront the witnesses against him. *Id*. at 21-33.[2] For these reasons, Appellant concludes that he is entitled to a new trial. *Id.* at 21, 58.

> Our standard of review is well-settled:
>
> The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Witmayer*, 144 A.3d 939, 949 (Pa. Super. 2016) (citation omitted). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012) (citing *McNanamon v. Washko*, 906 A.2d 1259, 1268–69 (Pa. Super. 2006)).

---

[2] In its opinion, the trial court suggested that Appellant failed to preserve his claim challenging the admissibility of the Comcast letter by not renewing the objection when the letter was formally entered into the record. Trial Court Opinion (TCO), 1/4/2017, at 2. Appellant was not required to renew the previously overruled objection to preserve his claim. Pa.R.E. 103(b) ("Once the court rules definitively on the record--either before or at trial--a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

"[A]n evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict." *Commonwealth v. DeJesus*, 880 A.2d 608, 614 (Pa. 2005) (citing *Commonwealth v. Story*, 383 A.2d 155, 164–66 (Pa. 1979)).

Hearsay is an out of court statement offered to prove the truth of the matter asserted. Pa.R.E. 801(C). Generally, it is not admissible, as it "lacks guarantees of trustworthiness fundamental to [our] system of jurisprudence." *Commonwealth v. Smith*, 681 A.2d 1288, 1290 (Pa. 1996) (quoting *Heddings v. Steele*, 526 A.2d 349, 351 (Pa. 1987)). In order to guarantee trustworthiness, the proponent of a hearsay statement must establish an exception to the rule of exclusion before it shall be admitted. *Id.*

At issue here is whether the Comcast letter meets the requirements of the exception for business records. Pennsylvania Rule of Evidence 803 provides, in relevant part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: ...
>
> **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if,
>
> (A)  the record was made at or near the time by – or from information transmitted by – someone with knowledge;
>
> (B)  the record was kept in the course of regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

- 11 -

(C) making the record was a regular practice of that activity

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, **or by a certification that complies with Rule 902(11)** or (12) or with a statute permitting certification; and

(E) neither the source of information nor other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6) (emphasis added). Rule of Evidence 902 provides:

The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted:

* * *

**(11) Certified Domestic Records of a Regularly Conducted Activity.** The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with Pa.R.C.P. No. 76. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record-- and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them.

Pa.R.E. 902(11).

The Commonwealth did not present testimony from a record custodian or other qualified witness. Rather, it sought to authenticate the Comcast letter by certification. **See** Declaration by Custodian or Other Qualified Person Pursuant to Pa.R.E. 902(11): Domestic Records of Regularly Conducted Activity, 4/18/16. The document consists of a single-page and includes boilerplate language asserting that the "attached documents" comport with the requirements of Rule 803(6)(A)-(C). **Id.** Further, we note that the document was executed nineteen months after the Comcast letter, signed by

- 12 -

an individual named Joseph Krysiak[3] who is identified only as "a Legal Analyst II," and tendered separately from the Comcast letter. *Id.* There were no additional documents attached, *e.g.*, the letter itself. *Id.* Thus, there is no discernable correlation between this document and the evidence it purports to authenticate. Based upon these deficiencies, we cannot accept that the Comcast letter is self-authenticating, *see* Pa.R.E. 902(11), nor can the Commonwealth guarantee the trustworthiness of its contents. *Smith*, 681 A.2d at 1290. Accordingly, the court erred in admitting this evidence.

Moreover, the court's error was not harmless. Although the Commonwealth presented evidence that Ms. Beck's account was accessed from numerous IP addresses, the Comcast letter provided the only direct evidence of Appellant's connection to one of those addresses, and that connection formed the specific, factual predicate for the five counts of unlawful use of a computer. We also agree with Appellant that the admission of the Comcast letter was prejudicial to Appellant in the context of the harassment conviction,[4] as the Commonwealth relied heavily upon Appellant's access to

---

[3] This name is printed by hand on the form and is not completely legible. We believe "Krysiak" is the correct spelling but are not certain.

[4] Harassment under (a)(7) provides that "[a] person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person … communicates repeatedly in a manner other than [through any lewd, lascivious, threatening or obscene words, language, drawings or caricatures; an anonymous manner; or at extremely inconvenient hours."] 18 Pa.C.S. § 2709(a)(7).

Ms. Beck's email to establish his intent to harass. ***See*** Appellant's Brief at 35-47. In its closing argument, the prosecutor for the Commonwealth asserted the following:

> [Appellant] knows [Ms. Beck] doesn't want to communicate with him. He even admits it in one of his text messages and you can see the way he is controlling her through these messages, harassing her. So what does he do to continue to control her and manipulate her? He decides he wants to get into her email because he wants to know who she is talking to, where she is going, what she is doing, so he finds out about a trip that [Ms. Beck] is planning for Falling Water and how does he do that? Through those e-mails. []On the very day that that e-mail is forwarded to her mom about the bed and breakfast in Falling Water her email is hacked and that is confirmed through the IP address [in Los Angeles] and we know that [Appellant] was in Los Angeles for work. [] And it all comes to light when [Ms. Beck] and [Mr. Mishra] go to Falling Water that day and who do they see but [Appellant]. Another way that he is just letting her know[:] I know where you are, I know who you are with, and I know what you are doing. He didn't have to say anything to her. She knew.

N.T., 4/19/16, at 248-50 (some formatting added).

As we are not convinced, beyond a reasonable doubt, that the admission of the Comcast letter did not contribute to the verdict, the court's error was not harmless. ***DeJesus***, 880 A.2d at 614. Accordingly, we are constrained

to conclude that the Appellant is entitled to a new trial.[5]  *Lopez*, 57 A.3d at 81.[6]

Next, Appellant avers that the court erred in admitting documents downloaded from GeekTools.com, as the documents and testimony about their contents constitute hearsay.  Appellant's Brief at 47-49.  According to

---

[5] As we dispose of Appellant's claim on the basis of his first argument, we need not examine his alternative argument.  Nevertheless, we note that Appellant asserts, for the first time on appeal, that the admission of the Comcast letter violated the Confrontation Clause of the Sixth Amendment to the United States Constitution.  *See* Appellant's Brief at 30-34.  Issues not properly preserved in the trial court are waived.  Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Elrod*, 572 A.2d 1229, 1232 (Pa. Super. 1990) (recognizing that even issues of constitutional dimension may be waived where raised for the first time on appeal).

[6] In Appellant's Application for Leave to File Post-Submission Supplemental Authority, Appellant "applied . . . for leave to file as post-submission supplemental authority" *Commonwealth v. Mangel*, ___ A.3d ___, 2018 Pa. Super. 57 (filed Mar. 15, 2018), "as it relates to the proper standard for authentication of electronic, social media evidence."  Appl. for Leave to File Post-Submission Suppl., 4/2/18, at 1-2.  However, none of Appellant's issues raised on appeal concern the authentication of electronic, social media evidence.  Appellant's first issue, analyzed above, involves the authentication of a business record, the Comcast letter, and not social media evidence.  Appellant's Brief at 21-46.  His alternative argument focused on the prejudicial nature of certain electronic communications, *id.* at 36-37, but did not concern the authentication of those communications, and we did not need to reach that argument, in any event.  None of Appellant's other issues on appeal relate to authentication or to electronic, social media evidence.  *Id.* at 2-3, 47-58. Thus, although we granted Appellant's Application for Leave to File Post-Submission Supplemental Authority and considered *Mangel*, 2018 Pa. Super. 57, we conclude that *Mangel* is inapposite to the current appeal.

Appellant, this evidence was offered to prove that Comcast was the internet service provider for IP address 98.239.142.39. *Id.*[7] We disagree.

As previously outlined, "hearsay is an out of court statement offered for the truth of the matter asserted and is inadmissible unless it falls within an exception to the hearsay rule." ***Commonwealth v. Mosley***, 114 A.3d 1072, 1084 (Pa. Super. 2015); ***see also*** Pa.R.E. 801, 802. Such exceptions include statements that would establish motive, the existence of a plan, or would similarly "complete the story." ***See Commonwealth v. Mayhue***, 639 A.2d 421, 434 (Pa. 1994); ***see also Commonwealth v. Levanduski***, 907 A.2d 3, 13 (Pa. Super. 2006). Specifically, "[s]ometimes, out-of-court statements are offered not to prove the truth of the matter asserted but, for example, to explain the course of conduct undertaken by an investigating police officer. Such statements are not hearsay." ***Commonwealth v. Hardy***, 918 A.2d 766, 777 (Pa. Super. 2007) (citation omitted); ***accord Commonwealth v.***

---

[7] The trial court's analysis for this issue is, in its entirety:

> Appellant argues that the Court erred by admitting testimony regarding Exhibit 70, computer printouts from GeekTools.com, and any related testimony about the exhibit on grounds of hearsay. In response to this issue, on cross examination Appellant at no point objected to the testimony given by Officer Jessica Meyer[] about Exhibit 70, nor to its later entry into evidence on any grounds, including hearsay, in order to preserve the issue.

TCO at 5-6. However, during Officer Meyer's testimony, Appellant objected to any reference to the website, GeekTools.com, as hearsay. N.T., 4/19/16, at 14. Thus, Appellant preserved this challenge.

*Chmiel*, 889 A.2d 501, 532–33 (Pa. 2005); *Commonwealth v. Dent*, 837 A.2d 571, 579 (Pa. Super. 2003) ("It is, of course, well established that certain out-of-court statements offered to explain a course of police conduct are admissible.  Such statements do not constitute hearsay since they are not offered for the truth of the matters asserted; rather, they are offered merely to show the information upon which police acted." (citations omitted)).

Here, testimony about the Geektools.com website and the accompanying thirty-six printouts displaying the contents of Officer Meyer's search were not entered into evidence to prove that Appellant unlawfully accessed Ms. Beck's email.  *Chmiel*, 889 A.2d at 532–33; *Mosley*, 114 A.3d at 1084; *Hardy*, 918 A.2d at 777; *Dent*, 837 A.2d 571, 579.  Evidence of the website merely described the progression of Officer Meyer's investigation.  As such, these materials were admissible.

In his third issue, Appellant claims that the evidence was insufficient to sustain his convictions for unlawful use of a computer, because Ms. Beck, Mr. Mishra, and Officer Meyer were not competent to draw conclusions from the information in Ms. Beck's email account settings that depicted multiple instances of disparate IP addresses accessing her account from approximate geographic locations.  *See* Appellant's Brief at 49-58.  Appellant continues:

> although the Commonwealth relied heavily on technical information purportedly appearing in the security settings of [Ms.] Beck's Gmail account, the Commonwealth failed to present an expert witness to interpret that information, relying instead on [these] three lay witnesses with no relevant training to interpret

that technical information and to explain its significance to the jury.

*Id.* at 49-50. He contends that the factual issues – specifically, the use of Google Data and an IP address to prove unlawful access of Ms. Beck's computer -- were "beyond the ken of the ordinary layman" and "require expert testimony," because "the subject of unique IP addresses as they relate to web-based e-mail accounts is both technical and complex." *Id.* at 50-51, 53. He concludes: "The Commonwealth's lay witnesses were therefore incapable of reliably interpreting the Google images or the information they contained because they lacked special training or experience in computers or computer forensics." *Id.* at 56. As the Commonwealth "relied exclusively on its lay witnesses to testify in support of the proposition that the Google images established that [Ms.] Beck's account was accessed by someone physically located at the approximate location (based on IP) appearing in the images," which Appellant argues was improperly admitted, the "evidence was, therefore, legally insufficient to establish that [Appellant] perpetrated the five computer crimes." *Id.* at 57-58 (internal brackets and quotation marks omitted).

We have uncovered no Pennsylvania case law on this issue, and neither party nor the trial court has provided us with any. We thus believe that this appeal is a case of first impression for our Pennsylvania courts. When confronted with a question heretofore unaddressed by the courts of this Commonwealth, we may turn to the courts of other jurisdictions. "Although we are not bound by those decisions," "we may use decisions from other

jurisdictions for guidance to the degree we find them useful and not incompatible with Pennsylvania law." ***Newell v. Mont. W., Inc.***, 154 A.3d 819, 823 & n.6 (Pa. Super. 2017) (citation and internal quotation marks omitted). Upon our review, we have discovered that the question of whether expert testimony is required to explain records of email transmissions and the nature of IP addresses has only been considered by a paucity of other jurisdictions. However, in those handful of jurisdictions that have ruminated on the issue, all have agreed that expert testimony is required and that the testimony of a lay witness is insufficient to permit the admission of e-mail transmission and IP address records and the affiliation between IP addresses and physical addresses.

The most recent case uncovered by our research that analyzes this question is ***People v. Garrison***, 411 P.3d 270 (Colo. App. 2017), ***cert. denied***, 2018 WL 582107, No. 17SC677 (Colo. filed Jan. 29, 2018). In ***Garrison***, the appellant had established a Gmail account through Google in the victim's name; when police subpoenaed Google about the Gmail account, Google identified two IP addresses associated with the Gmail account – one at the appellant's residence and the other at the appellant's wife's employer. ***Id.*** at 273. The Colorado Court of Appeals outlined the general issue, as follows:

> The common knowledge and experience of an ordinary person have become one marker of the boundary separating lay from expert testimony. This case involves lay witness testimony about e-mail. So, one might wonder whether this ubiquitous person would be aware that

> • the record of each e-mail transmission includes an Internet Protocol (IP) address from which the transmission initiated;
>
> • the IP address can be linked to an Internet service provider (ISP); and
>
> • in turn, the ISP can often trace the IP address to the physical address of a particular ISP customer?
>
> Despite the dramatic increase in use of e-mail, we join the few jurisdictions to have addressed this question and conclude that such a person would not be aware of these facts, at least in the combination used by the prosecution to explain how the investigation began with charges against the victim, but led to evidence of criminal acts by defendant, Lawson P. Garrison.

*Id.* at 272-73.

In its analysis, *id.* at 278, the Colorado Court of Appeals relied on

Colorado Rule of Evidence 701, governing the admission of lay testimony:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> > (a) rationally based on the perception of the witness,
> >
> > (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and
> >
> > (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

C.R.E. 701 (some formatting added).

This rule is substantially similar to the Pennsylvania Rule of Evidence

governing the admission of lay testimony:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> > (a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

The Colorado court continued to explain the law distinguishing lay testimony from expert testimony:

> After Garrison's trial, our supreme court "clarified the standard that distinguishes lay testimony from expert testimony," [***People v.*** ***Howard-Walker***, [___ P.3d ___, 2017 COA 81M] ¶ 50 [(Colo. App. filed June 15, 2017), in three opinions: ***Marsh v. People***, 2017 CO 10M, 389 P.3d 100; ***Venalonzo v. People***, 2017 CO 9, ¶¶ 17-25, 388 P.3d 868; and ***People v. Ramos***, 2017 CO 6, 388 P.3d 888.
>
> Take the standard first. To determine "whether testimony is lay testimony under CRE 701 or expert testimony under CRE 702, the trial court must look to the basis for the opinion." ***Venalonzo***, ¶ 23.
>
> Then consider its reasoning. To distinguish between lay and expert testimony, "the proper inquiry is not whether a witness draws on her personal experiences to inform her testimony; all witnesses rely on their personal experience when testifying." ***Id.*** at ¶ 22. Rather, "the nature of the experiences that could form the opinion's basis ... determines whether the testimony is lay or expert opinion." So, **expert testimony "is that which goes beyond the realm of common experience and requires experience, skills, or knowledge that the ordinary person would not have."** ***Id.***
>
> The supreme court recognized that this "distinction can be a difficult one." ***Id.*** at ¶ 24. To be sure, "[t]his is particularly the case when the witness is a police officer." ***Howard-Walker***, ¶ 51.

***Garrison***, 411 P.3d at 278 (emphasis added).

This Court has articulated an analogous standard to distinguish expert testimony from lay testimony – *i.e.*, that expert testimony "reflects the

application of expertise" and does not "stray[] into matters of common knowledge." *Nobles v. Staples, Inc.*, 150 A.3d 110, 114 (Pa. Super. 2016) (citation omitted). We have further explained that expert testimony "requires knowledge, information or skill beyond what is possessed by the ordinary juror," *Ovitsky v. Capital City Econ. Dev. Corp.*, 846 A.2d 124, 126 (Pa. Super. 2004) (quoting *Commonwealth v. Carter*, 589 A.2d 1133, 1134 (Pa. Super. 1991)), and that expert testimony must be "distinctly related to a science, skill or occupation which is beyond the knowledge or experience of an average lay person" and does not "involve[] a matter of common knowledge." *Commonwealth v. Minerd*, 753 A.2d 225, 230 (Pa. 2000). Thus, the law used by the Colorado Court of Appeals is compatible with Pennsylvania law. *See Newell*, 154 A.3d at 823 n.6.

> The Colorado Court of Appeals continued its analysis, as follows:

> Everyone would agree that e-mail has become "a significant form of communications." 1 Raymond T. Nimmer, *Information Law* § 8:53, Westlaw (database updated May 2017). At least 250 reported Colorado cases refer to "e-mail."[8] For this reason, an ordinary person may have some idea of what role an IP address plays in e-mail. . . .

> But the testimony by Detective Garcia and Officer Calloway went much farther.

> Would the character string produced by Google be more than a maze to the ordinary person? Probably not. . . . But the officers picked out the IP addresses.

---

[8] A similar search of Pennsylvania cases yielded a result of about 660 published opinions and at least 1,980 cases total that refer to "email" or "e-mail."

Yet, even if an ordinary person could also pick out the IP addresses, why would such a person know more than Officer Calloway? After all, he acknowledged that after having received these addresses from Google, he sent them to the department's computer investigators to identify the associated ISPs.

And what reason would an ordinary person have to understand the final step in the investigation—an ISP's ability to trace an IP address to a particular customer's physical location? The Attorney General does not suggest such a reason, nor can we discern one.

. . .

[T]he concept of an e-mail transmission including an IP address, which can be linked to an ISP, and in turn traced to the physical location of a particular ISP customer, is not within the knowledge or experience of ordinary people. Thus, because some of the police testimony on direct examination was based on particular experience and specialized knowledge within the scope of Rule 702, we conclude that the trial court abused its discretion in admitting this portion of the testimony as lay testimony. *See* CRE 701(c).

*Garrison*, 411 P.3d at 279-81 (footnote omitted).

The Court of Special Appeals of Maryland also considered whether "the nature of an IP address" and "the arcane question of whether each IP address is 'unique' to a particular device or network" requires expert testimony in *Ali v. State*, 2017 WL 128636, No. 1252 Sept. Term 2014 (Md. Ct. Spec. App. filed Jan. 13, 2017) (unreported).[9] In that case, the appellant repeatedly threatened and harassed her former psychologist by "sending her numerous text messages, hacking into her private email account, and copying a

---

[9] Although we prefer to avoid citation to unreported opinions of any court, the scarcity of case law on this subject compels us to consider all available writings on this topic. The court in *Garrison* likewise observed: "The relative paucity of precedent addressing common knowledge of IP addresses may be explained because in the vast majority of reported cases, testimony on IP addresses has been presented through expert witnesses." 411 P.3d at 280.

privileged communication between her and her attorney." 2017 WL 128636 at *1. During the investigation, a detective subpoenaed certified records from internet service providers. *Id.* at *2. Those records included an "access history log" that "would disclose the IP address of the device or network that was used to access the [psychologist's email] account." *Id.* at *3. "[A]n IP address associated with [the appellant] had accessed [the psychologist]'s email accounts." *Id.* This "access history log" is therefore the same as the "account history" at issue in the current case. *Id.*; N.T., 4/18/16, at 123.

The Court of Special Appeals considered whether expert testimony was required to explain the "unique" nature of an IP address and what conclusions can be drawn therefrom. 2017 WL 128636 at *5. The court determined that these were "question[s] of computer science that [are] **beyond the ken of ordinary laypersons** and, hence, ordinarily should be the subject of expert testimony." *Id.* (emphasis added) (citation and internal quotation marks omitted). This language of knowledge "beyond the ken" of ordinary laypersons parallels language that has been used by the courts of this Commonwealth to explain expert testimony. *See, e.g.*, *Commonwealth v. Griffith*, 32 A.3d 1231, 1239 (Pa. 2011) ("Pursuant to our general standard, a need for expert testimony arises when the jury is confronted with factual issues whose resolution requires knowledge **beyond the ken of the ordinary layman**." (emphasis added) (citation and internal quotation marks omitted)); *Young v. Com., Dep't of Transp.*, 744 A.2d 1276, 1278 (Pa. 2000) ("[T]he employment of testimony of an expert rises from necessity, a necessity born

- 24 -

of the fact that the subject matter of the inquiry is one involving special skill and training **beyond the ken of the ordinary layman.**" (emphasis added) (citation and internal brackets omitted)); ***Burlington Coat Factory of Pa., LLC v. Grace Const. Mgmt. Co., LLC***, 126 A.3d 1010, 1021 (Pa. Super. 2015) ("Expert testimony is necessary when a case presents questions **beyond the ken of the average layperson**." (emphasis added)).

> The Court of Special Appeals of Maryland continued:
>
> the detective based his conclusions on subpoenaed documents that were not themselves self-explanatory, but required some degree of specialized training and erudition to interpret. ***See State v. Payne***, 440 Md. 680, 700 (2014). Most notably, the "access history log" for [the psychologist]'s email account contains columns labeled "pass" and "fail." The meaning of those columns and their contents would be opaque at best to ordinary laypersons, but the detective, implicitly relying on his specialized training, purported to interpret them to indicate whether an attempt to access the account had succeeded.

***Ali***, 2017 WL 128636 at *5. The court concluded that, due to the need for this specialized training and education, expert testimony was required. ***Id.***

A case from the United States District Court for the Southern District of Florida, ***Hydentra HLP Int. Ltd. v. Luchian***, 2016 WL 5951808, Case No. 1:15-cv-22134-UU (S.D. Fla. filed June 2, 2016), arose "out of the uploading of Plaintiff's protected videos onto Defendants' websites by third-party users." 2016 WL 5951808 at *1. The plaintiff intended to rely upon the testimony of Jason Tucker, the director of an intellectual property and anti-piracy investigation company, that "of the 111 'pieces of Plaintiff's video content' that were uploaded to the database, 11 of the uploaded videos display an [IP]

address 'from which the video was uploaded' that begins with 0.0, and an IP address that begins with 0.0 means that it is from an internal, local network." *Id.* at *11. However, the plaintiff did not designate Mr. Tucker to testify as an expert witness. *Id.*

In considering the admissibility of Mr. Tucker's testimony, the court relied upon Federal Rule of Evidence 701, which is identical to Pennsylvania Rule of Evidence 701. Based upon this Rule, the United States District Court for the Southern District of Florida concluded:

> In this case, the testimony of Jason Tucker is plainly offered to support the broad claim that Defendants themselves uploaded some of the copyright videos onto their websites based upon his review of the 111 IP addresses. This proposition is an inference well beyond what witnesses perceive in their day-to-day lives; rather, it is a conclusion that would require "specialized knowledge," [Fed. R. Evid.] 701, and must be proved by an appropriately credentialed expert witness to be properly admitted.

2016 WL 5951808 at *11. The court thus decided that expert testimony was required to establish the connection between an IP address and the physical origin of the computer or other device and precluded Mr. Tucker from testifying. *Id.*

In **NTP Marble, Inc. v. AAA Hellenic Marble, Inc.**, 2012 WL 607975, Civil Action No. 09-cv-05783 (E.D. Pa. filed Feb. 27, 2012) (memorandum), the United States District Court for the Eastern District of Pennsylvania considered whether it could take judicial notice of "the significance of unique IP addresses and web-based email accounts." 2012 WL 607975 at *6 n.10. The court cites to **Ohio Bell Tel. Co. v. Pub. Util. Comm'n of Ohio**, 301

U.S. 292, 301 (1937), to establish that "courts take judicial notice of matters of common knowledge." 2012 WL 607975 at *6 n.10.[10] The court found that how unique IP addresses and web-based email accounts are "obtained, maintained, monitored, controlled, and accessed are not matters of 'common knowledge,' and thus it would be inappropriate for this [c]ourt to take judicial notice" of those facts. *Id.*

Although **NTP Marble** was considering whether the court could take judicial notice and the current appeal concerns whether expert testimony is required, **NTP Marble**'s conclusion that the maintenance, monitoring, control, and access of unique IP addresses and web-based email accounts are not "common knowledge" is still useful. 2012 WL 607975 at *6 n.10. As noted above, expert testimony does not "involve[] a matter of common knowledge." **Minerd**, 753 A.2d at 230; **see also Nobles**, 150 A.3d at 114 (expert testimony "reflects the application of expertise" and does not "stray[] into matters of common knowledge"). Thus, if, pursuant to **NTP Marble**, "the significance of unique IP addresses and web-based email accounts" is not

---

[10] Pennsylvania uses this same formula for determining whether a court can take judicial notice of a fact. "A court may take judicial notice of an indisputable adjudicative fact. A fact is indisputable if it is so well established as to be a matter of common knowledge." **Commonwealth v. Brown**, 839 A.2d 433, 435 (Pa. Super. 2003) (internal citation and quotation marks omitted) (holding that information obtained from Internet as to distance between offense and nearby school could not serve as basis upon which trial court took judicial notice that defendant delivered drugs within 1,000 feet of a school zone, because the Internet site, MapQuest, which purports to establish distances between two locations, is not so reliable that its accuracy cannot reasonably be questioned).

"common knowledge," and if expert testimony is necessary for areas outside of common knowledge, then "the significance of unique IP addresses and web-based email accounts" requires expert testimony. ***NTP Marble***, 2012 WL 607975 at *6 n.10; ***see also Nobles***, 150 A.3d at 114; ***Minerd***, 753 A.2d at 230.

Hence, although there is not extensive case law on the subject, all of the courts that have considered whether the connection between IP addresses and real-world locations requires expert testimony or if this link is common knowledge, have concluded that such information and any facts derived therefrom cannot be considered common knowledge and therefore require expert testimony. ***Garrison***, 411 P.3d 270; ***Ali***, 2017 WL 128636; ***Hydentra***, 2016 WL 5951808; ***see also NTP Marble***, 2012 WL 607975. Additionally, we have uncovered no case law concluding to the contrary.

Thus, we are constrained to agree with Appellant that the trial court abused its discretion in permitting Ms. Beck, Mr. Mishra, and Officer Meyer to draw conclusions from the information in Ms. Beck's email account settings that depicted multiple instances of disparate IP addresses accessing her account from approximate geographic locations. Appellant's Brief at 49-58; ***Witmayer***, 144 A.3d at 949. Any such information and conclusions drawn therefrom required expert testimony, and its admission via lay testimony was therefore improper. ***Garrison***, 411 P.3d 270; ***Ali***, 2017 WL 128636; ***Hydentra***, 2016 WL 5951808; ***see also NTP Marble***, 2012 WL 607975. We also agree with Appellant that, without establishing the affiliation between IP

addresses and real-world physical locations, the Commonwealth would not have been able to prove Appellant's unlawful use of computer convictions. Appellant's Brief at 57-58. Accordingly, Appellant suffered prejudice from improperly admitted evidence. For that reason, again, we must reverse and remand for a new trial. *Levant v. Leonard Wasserman Co.*, 284 A.2d 794 (Pa. 1971) (erroneous admission of evidence is grounds for reversal where it has a tendency to draw the minds of the jury from the issue and to prejudice, confuse, or mislead them); *Commonwealth ex rel. Buchakjian v. Buchakjian*, 447 A.2d 617 (Pa. Super. 1982) (especially where erroneously admitted evidence goes to the heart of a determinative issue, the court must reverse and remand for a new trial).

The Commonwealth, in its single issue on appeal, challenges the discretionary aspects of Appellant's sentence. Commonwealth's Brief at 17-23. The Commonwealth avers that the trial court failed to place sufficient reasons on the record for its deviation from the sentencing guidelines in sentencing Appellant to a mitigated range sentence. *Id*. at 14. Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. *Commonwealth v. Sierra*, 752 A.2d 910, 913 (Pa. Super. 2000). Prior to reaching the merits of a discretionary sentencing issue:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and

(4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006) (most citations omitted).

When appealing the discretionary aspects of a sentence, an appellant must invoke the appellate court's jurisdiction by including in his brief a separate concise statement demonstrating that there is a substantial question as to the appropriateness of the sentence under the Sentencing Code. *Commonwealth v. Mouzon*, 812 A.2d 617, 621 (Pa. 2002); Pa.R.A.P. 2119(f). "The requirement that an appellant separately set forth the reasons relied upon for allowance of appeal furthers the purpose evident in the Sentencing Code as a whole of limiting any challenges to the trial court's evaluation of the multitude of factors impinging on the sentencing decision to **exceptional** cases." *Commonwealth v. Phillips*, 946 A.2d 103, 112 (Pa. Super. 2008) (emphasis in original) (internal quotation marks omitted).

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *See Commonwealth v. Anderson*, 830 A.2d 1013, 1018 (Pa. Super. 2003). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra,* 752 A.2d at 912-13.

As an initial matter, we note that the Commonwealth timely filed a notice of appeal, preserved the instant issue at sentencing and in a post-sentence motion, and included a Pa.R.A.P. 2119(f) statement in its brief. However, we need not determine whether the Commonwealth has raised a substantial question for review on the merits, as the Commonwealth's cross-appeal is now moot given our disposition of Appellant's claims. Accordingly, we dismiss the Commonwealth's appeal.

Judgment of sentence vacated. Case remanded for a new trial. Appellant's Application for Leave to File Post-Submission Supplemental Authority granted. The Commonwealth's appeal dismissed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/4/2018