J-S12026-24

2025 PA Super 7

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
JOHN EDWARD GRUBBS 2ND :
:
Appellant : No. 1865 EDA 2023

Appeal from the Judgment of Sentence Entered March 20, 2023
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0000999-2022

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
JOHN EDWARD GRUBBS, II :
:
Appellant : No. 1866 EDA 2023

Appeal from the Judgment of Sentence Entered March 20, 2023
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0002246-2022

BEFORE: DUBOW, J., SULLIVAN, J., and BENDER, P.J.E.

OPINION BY SULLIVAN, J.: **FILED JANUARY 13, 2025**

John Edward Grubbs, II ("Grubbs") appeals from the judgment of

sentence entered following his jury convictions for several counts of robbery

– threat of immediate serious bodily injury and related offenses.[1] We affirm.

---

[1] **See** 18 Pa.C.S.A. § 3701(a)(1)(ii).

The trial court set forth the factual and procedural history as follows:

On October 5, 2020, around 4:45 a.m., [Grubbs] entered a 7-Eleven located [on] Veterans Highway[ in] Bristol, Bucks County, Pennsylvania. He was wearing sweatpants, a dark shirt, and a bandana across his face and over his head. He was also wearing purple-colored latex gloves and black sneakers with white trim. Two 7-Eleven employees were working behind the register at this time: Gail Cobb [("Cobb")] and Jay Patel [("Patel")]. [] Cobb is a middle-aged woman, who requires the assistance of a cane when walking. [] Patel is a younger man . . ..

When [Grubbs] entered the store, he walked to the coolers, stayed there for a while, and began walking up and down the snack aisles. [Grubbs] was not a regular customer at the store. [] Grubbs was observed glancing over at the register, and when the only other customer in the store at the time finished paying and left, [Grubbs] rushed up to the register and pulled a gun out of his right pocket.

While displaying the gun, [Grubbs] demanded that [] Cobb and [] Patel "give [him] all the money." [] Cobb had been counting the bills in the register when [Grubbs] arrived, so the cash drawer was sitting on the counter. Keeping the gun pointed toward [] Cobb and [] Patel, [Grubbs] grabbed the cash in the drawer. [] Cobb testified to feeling threatened, scared, and in shock as a result of [Grubbs's] conduct. [Grubbs] asked [] Cobb to open the other register, and when she told him she could not do so, [Grubbs] quickly left. In total, [Grubbs] stole $527 in cash, and the robbery was captured by video surveillance.

Two days later on October 7, 2020, Malik Khokhar [("Khokhar")] was working at the 7-Eleven [on] Neshaminy Boulevard in Bensalem Township, Bucks County . . .. [] Khokhar is originally from Pakistan[,] where he worked as a police officer. Around 1:00 a.m., [Grubbs] entered the store wearing a black bandana covering his head and a blue bandana covering his face. [Grubbs] approached [] Khokhar with a black gun in his right hand and commanded him to stand up and open the register. [] Khokhar pressed the emergency alert button behind the counter, but it was broken. [] Khokhar testified that he was scared and

- 2 -

thought maybe [Grubbs] wanted to kill him. At first, [] Khokhar believed [Grubbs] was holding a real gun. He grabbed at the gun for self-defense, and when it fell to the ground, it broke into multiple pieces. A physical altercation ensued between [] Khokhar and [Grubbs], leading the pair outside into the parking lot. During the scuffle, the bandanas covering [Grubbs's] head and face came off, allowing [] Khokhar to see his face. [Grubbs's] shirt also came off during the struggle.

[Grubbs] was able to grab money from the 7-Eleven register and used a plastic shopping bag to carry it. However, as a result of the altercation, some of the cash ended up on the floor and on the ground outside the store. [] Khokhar reported that he suffered injuries as a result of the physical struggle, including an injury to his wrist, which, at the time of his testimony, was still causing him residual problems, namely, paralysis when the weather turned cold. [Later, d]uring his [trial] testimony, [] Khokhar identified [Grubbs] in the courtroom as the perpetrator of the robbery. The robbery and ensuing altercation were captured by video surveillance.

Approximately three months later, in the early morning hours of January 18, 2021, Dane Silvani [("Silvani")] was working at the 7-Eleven located [on] Bristol Pike in Croydon, Bucks County . . .. [Grubbs] entered the store, wearing all black clothing, a black cap, and a surgical mask over his face. [Grubbs] was also wearing black shoes with white trim. [Grubbs] wandered around the store for a few minutes before approaching the checkout counter with a gun held in his right hand and pointed at [] Silvani's head. Silvani was able to observe that [Grubbs] was wearing clear surgical gloves on his hands. [Grubbs] came around to the employee side of the counter and demanded that Silvani open the cash register drawer and give him the money. In this moment, fearing death, the thought going through Silvani's head was "I do not want to die."

When Silvani opened one of the two cash register drawers, [Grubbs] took a plastic shopping bag off the counter, grabbed the money inside the register, and stuffed it into the bag. [Silvani] decided not to press the emergency alert button because of awareness that [Grubbs] would be able to see it being pressed. Silvani was also compelled to open the second cash register, and [Grubbs] proceeded to take all of the cash out of that register as well. Before [Grubbs] left the store, he also took multiple packs

of cigarette boxes from behind the counter. This robbery, as was true of the previous robberies involving [Grubbs], was captured on video surveillance.

* * * *

. . . Grubbs was identified by law enforcement officers as the individual who perpetrated these crimes, and accordingly[,] he was charged with multiple offenses under two criminal bills of information: CP-09-CR-0000999-2022 and CP-09-CR-0002246-2022. Specifically, [Grubbs] was charged under Criminal Information 999-2022 with[, *inter alia*,] one count of [r]obbery – [t]hreat of [i]mmediate [s]erious [b]odily [i]njury, a felony of the first degree[, for the robbery of Khokhar] . . ..

[Grubbs] was charged under Criminal Information 2246-2022 with[, *inter alia*,] two counts of [r]obbery – [t]hreat of [i]mmediate [s]erious [b]odily [i]njury, a felony of the first degree[, for the robbery of Cobbs and Silvani] . . ..

* * * *

. . . [At trial, the Commonwealth presented evidence including testimony by Detective Brian Oliverio ("Detective Oliverio"), who testified about, *inter alia*, Sprint phone records associated with Grubbs which showed a call placed approximately fifteen minutes after the October 7th robbery within one to two miles of the crime. Additionally, the Commonwealth briefly called Deputy Robert Landis ("Deputy Landis") to the stand to corroborate testimony by Khokhar that Grubbs had been moving his head around surreptitiously during Khokhar's testimony while Khokhar was being asked to identify Grubbs. Further, the Commonwealth called Detective Timothy Fuhrmann ("Detective Fuhrmann") to testify that a license plate recognition software ("LPR") captured the license plate of a vehicle registered to Grubbs near one of the robbery locations.] Subsequently, at the conclusion of presentation of four days of testimony and demonstrative evidence, a jury convicted [Grubbs] of all charges on both [b]ills of [c]riminal [i]nformation.

* * * *

[I]n March [] 2023, th[e trial c]ourt sentenced [Grubbs] on count one of [docket number] 999-2022 to[, *inter alia*,] a[n

- 4 -

aggregate] period of incarceration of not less than [ten] years nor more than [twenty] years in a state correctional facility with credit for time served dating back to December [] 2021. . . .

[For docket number] 2246-2022, [Grubbs] was sentenced to[, *inter alia*, an aggregate] period of incarceration of not less than 10 years nor more than 20 years at a state correctional facility, to run consecutively to the sentence imposed [in docket number] 999-2022. . . ..

On March 30, 2023, [Grubbs] timely filed two [post-sentence motions]: a "Motion to Modify and Reconsider Sentences" and a "Motion for a New Trial." On June 13, 2023, th[e trial c]ourt denied both [m]otions without a hearing, finding that they were without merit, and that they failed to delineate any averments which raised material issues not previously or properly considered at the time of the relevant proceedings. On July 12, 2023, [Grubbs] timely filed [n]otice[s] of [a]ppeal . . ..

Trial Ct. Op., 9/1/23, at 1-7 (paragraphs re-ordered for clarity; citations to the record omitted). Both Grubbs and the trial court complied with Pa.R.A.P. 1925.

Grubbs raises the following issues for our review:

1. Did the trial court err in permitting testimony from Detective Oliverio regarding the Sprint telephone records as the testimony was hearsay, constituted improper expert testimony, and was admitted without foundation?

2. Did the trial court err in permitting testimony from Detective Fuhrmann regarding the license plate readers and admitting [LPR evidence], as the testimony and evidence were hearsay and constituted improper expert testimony?

3. Did the trial court err in permitting Deputy Landis to testify regarding [Grubbs]'s actions in the courtroom, as such evidence was highly prejudicial?

Grubbs's Brief at 9.

All three of Grubbs's issues concern the trial court's evidentiary rulings. Our standard of review is as follows: "We review such determinations for an abuse of discretion. An abuse of discretion is the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality, as shown by the evidence of record." *Commonwealth v. Vance*, 316 A.3d 183, 189 (Pa. Super. 2024) (internal citations, quotations, and brackets omitted).

In his first two issues, Grubbs raises assertions of error concerning, *inter alia*, hearsay rulings and whether certain testimony constituted expert testimony. We set forth the applicable law here.

Hearsay is defined as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). *See also Commonwealth v. Manivannan*, 186 A.3d 472, 482 (Pa. Super. 2018) (defining hearsay). GPS data obtained from cellphone records is not hearsay. As this Court has recently explained:

> In *Commonwealth v. Wallace*, ––– Pa. ––––, 289 A.3d 894 (2023), our Supreme Court recently held that GPS data is not hearsay evidence. *Id*. at 907-08. The *Wallace* Court explained that GPS location data is not a statement made by a person; rather, it is data collected electronically. *Id*. at 904. As such, GPS location data cannot constitute hearsay because Rule 801 is clear that "a statement is a written or oral assertion of *a person*." *Id*. (emphasis in original). Accordingly, pursuant to the holding in *Wallace* and the plain language of Rule 801, an automatically generated GPS record, like the record at issue in this case, does not constitute a statement, and therefore, is not hearsay.

*Vance*, 316 A.3d at 189. That is, generally, where information is collected electronically by a computerized device is not a statement made by a person and, therefore, "cannot constitute hearsay." *Wallace*, 289 A.3d at 904.

The Rules of Evidence provide that an expert may give testimony under the following conditions:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. Rule 701 provides that a witness may offer lay testimony rationally based on the witness's perception that is helpful to determining a fact in issue, and that is not based on scientific, technical, or other specialized knowledge. *See* Pa.R.E. 701. *See also Commonwealth v. Huggins*, 68 A.3d 962, 967 (Pa. Super. 2013) (explaining that expert testimony concerns "scientific, technical or other specialized knowledge beyond that possessed by a layperson," whereas lay testimony "must be rationally based on that witness'[s] perceptions").

As for testimony about the contents of cell phone records, while expert testimony is permissible, there is precedent for the proposition that, where

- 7 -

the testimony is non-technical and not beyond the comprehension of laypersons, said testimony is not expert testimony. The United States Third Circuit Court of Appeals has concluded, for example, that where a witness testifies merely to the contents of cell phone records, including cell-site location information ("CSLI"), or explains that cell phones are "designed to find the strongest signal," this testimony does not require "scientific, technical, or other specialized knowledge," because "[a]ny cell phone user of average intelligence would be able to understand that the strength of one's cell phone reception depends largely on one's proximity to a cell phone tower." *U.S. v. Baker*, 496 Fed. Appx. 201, 204 n.1 (3d Cir. 2012) (unpublished);[2] *but cf*. *Vance*, 316 A.3d at 193-94 (concluding that the trial court did not abuse its discretion in permitting an officer, who prepared an expert report about cell

_____

[2] Federal Rule of Appellate Procedure 32.1(a) permits the citation of unpublished decisions issued on or after January 1, 2007. *See* F.R.A.P. 32.1(a). *See also Commonwealth v. Stone*, 273 A.3d 1163, 1169 n.7 (Pa. Super. 2022) (noting that federal court decisions are not binding on this Court, but may be considered for their persuasive value); *Commonwealth v. Rose*, 172 A.3d 1121, 1130-31 (Pa. Super. 2017) (looking to federal case law discussing F.R.E. 701 and 702 to determine whether a police officer's testimony was lay opinion admissible pursuant to Pa.R.E. 701); *but cf*. Pa.R.E. 702 cmt. (noting that Pa.R.E. 702 differs from F.R.E. 702 because the Pennsylvania rule requires the specialized knowledge to be beyond that possessed by the average layperson, and also that the expert's methodology be generally accepted in the relevant field). We find *Baker* persuasive insofar as it concludes that merely reading the contents of cell phone records, including CSLI, may constitute lay testimony because the average layperson understands that cell phones connect to nearby towers.

- 8 -

phone records including CSLI, specifically, Google GPS location data, to testify as an expert).

Regarding authentication, Pennsylvania Rule of Evidence 901(a) provides that "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). Authentication "generally entails a relatively low burden of proof . . .." **Commonwealth v. Kurtz**, 294 A.3d 509, 527 n.12 (Pa. Super. 2023), *appeal granted*, 306 A.3d 1287 (Pa. 2023). Rule 901 may be satisfied by the testimony of a witness with personal knowledge or by circumstantial evidence. **See id**.

In his first issue, Grubbs argues his phone records were hearsay, and, because they were hearsay, they were only admissible if an applicable exception applied. **See** Grubbs's Brief at 13. Because, Grubbs argues, the trial court erred in concluding the records were admissible under the business records exception codified in Pennsylvania Rule of Evidence 803(6), the phone records were inadmissible. **See id**. at 16. Grubbs additionally argues that the telephone records were not self-authenticating pursuant to Pennsylvania Rule of Evidence 902(11), and that the Commonwealth failed to lay a foundation for the phone records to show how they were obtained and that they were connected to his phone. **See id**. at 17-19. Lastly, Grubbs argues

Detective Oliverio gave expert testimony without being qualified as an expert. *See id*. at 20-22.

Initially, we conclude that Grubbs's issue, insofar as it relies on a hearsay argument, merits no relief. As this Court has clarified, CSLI compiled electronically, is not made by people, and therefore, cannot be hearsay. *See Vance*, 316 A.3d at 189.

As for the remainder of Grubbs's issue, namely, whether the records were properly authenticated, whether there was a foundation for them, and whether Detective Oliverio testified as an expert, the trial court concluded Grubbs is due no relief: The records, the court explained, were "created systematically and contemporaneously by the telecommunicating company, and were not created in anticipation of litigation. . . . There was no indication that the phone records lacked trustworthiness," and, therefore, "[a] witness from Sprint . . . was not [required for] admission of the . . . phone records." Trial Ct. Op., 9/1/23, at 19. Additionally, Detective Oliverio did not offer "analysis, interpretations, or opinions regarding the contents of the records. Instead, [he] merely explained the contents of the records, which [were] not beyond the ability or purview of a layperson." *Id*. at 21. Indeed,

> . . . Detective Oliverio simply explained the contents of the cell tower records created by Sprint, reflecting that [Grubbs's] cell[] phone was involved in communications in the vicinity of a cell tower near the Bensalem 7-Eleven involved in the October 7, 2020 robbery. . . . [His] non-scientific, non-technical testimony regarding the Sprint phone records did not constitute expert testimony . . ..

*Id*. at 22 (internal citation to the record omitted).

Following our review, we conclude Grubbs's arguments do not warrant relief. While the trial court concluded the phone records were admissible under the business records hearsay exception, we need not reach that question because, as noted above, Grubbs's phone records were not hearsay, *see Vance*, 316 A.3d at 189; *Wallace*, 289 A.3d at 904, and accordingly, the Commonwealth was not required to show that they were admissible pursuant to the business records exception.[3] Additionally, Detective Oliverio testified that Sprint produced Grubbs's telephone records, *see* N.T., 12/7/22, at 30-31, and Detective Oliverio was subject to cross-examination during which Grubbs elicited testimony from the detective confirming that Sprint produced the records. *See id*. at 60. This is sufficient for the trial court to conclude the evidence offered was what the proponent claimed. Pa.R.E. 901. *See also Kurtz*, 294 A.3d at 527 n.12 (stating that authentication is a low burden of proof and may be satisfied by circumstantial evidence).[4] Further, our review

---

[3] We may affirm a trial court's evidentiary ruling if correct on grounds other than those relied on by the trial court. *See Commonwealth v. Johnson*, 160 A.3d 127, 144 n.15 (Pa. 2017).

[4] Additionally, even if our holding hinged on an application of the business records exception, Grubbs would nevertheless be due no relief, because this Court has recently held that the custodian of the records need not authenticate the records so long as the testifying witness can provide sufficient information to justify the presumption of trustworthiness of the records. *See Commonwealth v. Nabried*, --- A.3d ----, 2024 WL 4821792 at *3 (Pa. Super. 2024).

- 11 -

discloses Detective Oliverio testified that the records gave a longitude and latitude for each antenna Grubbs's phone was connected to at a given time, after which Detective Oliverio put the coordinates into Google to determine the location of the coordinates. *See id*. at 32. Detective Oliverio gave no further information about the operation of cell phones and cell towers, and thus utilized no specialized knowledge in his testimony. Therefore, we conclude that the trial court did not abuse its discretion in determining that Detective Oliverio did not testify in capacity as an expert. *See Huggins*, 68 A.3d at 967; *Baker*, 496 Fed. Appx. 201, 204 n.1. Accordingly, Grubbs's first issue warrants no relief.[5]

In his second issue, Grubbs argues the trial court erred in admitting evidence pertaining to a license plate reader ("LPR"). Grubbs first maintains

_____

[5] Even if the trial court erred in admitting testimony about the cellphone records, Grubbs would still be due no relief. We note these records pertained to the October 7th robbery, during which Khokhar fought Grubbs off and grabbed the bandanna off Grubbs's head, after which Khokhar could see Grubbs's face under bright light. *See* N.T., 12/6/22, at 97-98. As discussed further below, once Grubbs stopped moving evasively at trial, Khokhar was able to identify him. *See id*. at 109. Additionally, some of Grubbs's clothing, including a t-shirt, came off during the robbery, *see id*. at 100, and Grubbs was a major contributor to a mixture of DNA taken from the t-shirt recovered from this robbery. *See* N.T., 12/7/22, at 20-23, 92-97. *See also*, *e.g.*, *Commonwealth v. Tate*, 323 A.2d 188, 190-91 (erroneously admitted testimony identifying the defendant was harmless error were there were identifications by other eyewitnesses who had "ample and adequate opportunity to observe" the defendant); *Commonwealth v. Jacoby*, 170 A.3d 1065, 1085-86 (Pa. 2017) (erroneously admitted evidence is harmless error where merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence).

that the LPR records constituted hearsay, and because the business records exception did not apply, the evidence was inadmissible. *See* Grubbs's Brief at 22-24. Grubbs further asserts that Detective Furhmann improperly testified as an expert about the LPRs because he "interpreted and analyzed the information." Grubbs's Brief at 24. Specifically, he testified "regarding where the LPRs were located, how they operated, and how to access the LPR system." *Id*.

Initially, as with Grubbs's challenge to the admission of his cell phone records, we conclude that the LPR information was not hearsay because it was data captured electronically rather than a statement by a person. *See Vance*, 316 A.3d at 189. Thus, Grubbs is due no relief on this claim. As for Grubbs's related argument, *i.e.*, that Detective Furhmann offered expert testimony, the trial court considered Grubbs's issue and concluded it merits no relief. The trial court explained: Detective Furhmann did not offer expert testimony because he did not "offer[] analysis, interpretations, or opinions regarding the contents of the records[, but] merely explained the contents of the records, which was not beyond the ability or purview of a layperson." Trial Ct. Op., 9/1/23, at 21. The court explained that Detective Furhmann "simply explained the contents of the license plate reader records and corresponding PDF printouts. [He] did not engage in scientific or technical interpretation of the records, nor did he present information that exceeded the knowledge or understanding of a layperson." *Id*. at 23.

Following our review, we conclude Grubbs has failed to show that Detective Furhmann offered impermissible expert testimony. Detective Furhmann explained that license plate readers "are cameras that are set up along different highways or roadways for a variety of different reasons, that they record the license plate numbers that drive by them, essentially every license plate that drives by them, and they're kept indefinitely." N.T., 12/7/22, at 142. He explained where various LPRs were operating, and that the relevant ones were functioning at the relevant time. *See id*. at 142-45. He further detailed that he had a username and log-in credentials to a web-based portal where he could view the LPR information, and search by date, location, "tag" (license plate number), and partial tag. *See id*. at 149-50. We discern no testimony by Detective Fuhrmann that required the exercise of specialized scientific, technical, or other specialized knowledge beyond that possessed by a layperson, and Grubbs does not explain how this information would have been beyond the ken of a layperson. *See Huggins*, 68 A.3d at 967. Accordingly, Grubbs's argument merits no relief.

In his last issue, Grubbs argues the trial court erred in permitting Deputy Landis to testify regarding Grubbs's actions during the testimony of Khokhar, namely, that when the Commonwealth first asked Khokhar to identify him and Khokhar was unable to, Grubbs was moving evasively to avoid identification by Khokhar, because the testimony was irrelevant and unduly prejudicial.

Before addressing Grubbs's issue, we must determine whether he preserved it. Initially, we note that while Grubbs challenged the admission of testimony by Deputy Landis, it was not on the basis of relevance, *see* N.T., 12/7/22, at 7-15, but, rather, that Deputy Landis's testimony would be cumulative of the jury's observations of Grubbs, since the jury would have been able to see whether Grubbs had acted evasively during Khokhar's testimony, and unfair because of Deputy Landis's position of authority. Accordingly, we conclude that Grubbs has waived his relevance argument. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal").

As for Grubbs's remaining argument, namely, that Deputy Landis's testimony was unduly prejudicial, we set forth the law as follows. As noted above, our standard of review for evidentiary issues is abuse of discretion. *See Vance*, 316 A.3d at 189. Additionally, Pennsylvania Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. The comment to the rule explains that "unfair prejudice" means a "tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Id*., cmt. Our Supreme Court has previously addressed this same issue, namely, whether it was "reversible error

- 15 -

for the trial court to have permitted a court officer to testify concerning her observation, during trial, of a conversation between [the defendant] and a defense witness," and the Court concluded this was not reversible error. ***Commonwealth v. Taylor***, 414 A.2d 1012, 1012-13 (Pa. 1980).

Grubbs argues that Deputy Landis's testimony was unduly prejudicial because the jury would have been able to see whether Grubbs was acting evasively during Khokhar's testimony. *See* Grubbs's Brief at 27. Grubbs argues Deputy Landis's testimony was also unduly prejudicial based on his status as a law enforcement officer, because the jury gave him "additional credibility." *Id*. at 27-28. Grubbs argues in passing that Deputy Landis's testimony also resulted in undue delay.

The trial court considered this issue and concluded it is meritless. The court noted that Khokhar, during direct examination, first failed to identify Grubbs but later identified him as the person who robbed him. Khokhar explained that Grubbs had moved, which is why he was unable to identify Grubbs initially, but that when Grubbs moved again, he was able to make the identification. *See* N.T., 12/6/23, at 113; *accord* Trial Ct. Op., 9/1/23, at 16. The court accepted the Commonwealth's offer of proof, namely, that the jury may not have been able to see whether Grubbs had, "in fact, turned his face away from the witness stand during [] Khokhar's testimony." Trial Ct. Op., 9/1/23, at 16-17. The court found no undue prejudice because the parties had "ample opportunity . . . to examine and cross-examine [him about] his

identification of [Grubbs]." Trial Ct. Op., 9/1/23, at 16. Further, the court prohibited Deputy Landis from explaining to the jury that it was his job to "specifically oversee [Grubbs] in the courtroom." Trial Ct. Op., 9/1/23, at 16-17.

We conclude that Grubbs has failed to show the trial court abused its discretion by permitting Deputy Landis to testify to Grubbs's behavior during the trial. We note initially that Khokhar was born in Pakistan and spoke English with a "bit of an accent." N.T., 12/6/23, at 91. When asked about his in-court identification of Grubbs, Khokhar explained:

> . . . So when right now he moved his face, I look his face, so identify.

\* \* \* \*

> . . . When officer tell me to please check in this room, so he's faced like this, moving. Right now he moved, so I identify.

\* \* \* \*

> . . . [T]hat time he was looking like this, not like this. Right now he move it, I identify him.

*Id*. at 113. During a side-bar prior to Deputy Landis's testimony, the trial court noted that while Khokhar had difficulty communicating during the trial, the court interpreted Khokhar as testifying that Grubbs had been "turning his head" before Khokhar identified him. *See* N.T., 12/7/23, at 10-11. The Commonwealth, during its offer of proof, explained that the jury would not necessarily have been looking at Grubbs during Khokhar's testimony, and, therefore, Deputy Landis's testimony would be useful for the jury as

corroboration of Khokhar's testimony. Because Deputy Landis's testimony was relevant to the issue of Khokhar's credibility in testifying that Grubbs had been moving his head during Khokhar's testimony, and the trial court prohibited Deputy Landis from testifying about his reasons for being in the courtroom in the first place so as to minimize prejudice to Grubbs, we cannot conclude the trial court abused its discretion in permitting the testimony. *See Vance*, 316 A.3d at 189 (abuse of discretion standard of review); *Taylor*, 414 A.2d at 1012-13 (no abuse of discretion in a trial court permitting an officer to testify to a defendant's in-court actions).

As none of Grubbs's issue merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/13/2025